UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **LORI J. MCCALLISTER**,<br><br>　　　　　　Plaintiff,<br><br>　　v.<br><br>**LOUIS DEJOY**, in his official capacity as United States Postmaster General, United States Postal Service,<br><br>　　　　　　Defendant. | Case No. 22-cv-1330 (CRC) |

## MEMORANDUM OPINION

　　Plaintiff Lori McCallister, a postal inspector with the United States Postal Service, worked remotely for years to support the Service's national headquarters in Washington, D.C. In August 2020, however, McCallister's supervisor ordered her to relocate to Washington. That prompted McCallister to file this lawsuit against Postmaster General Louis Dejoy in his official capacity, claiming that her transfer constituted sex discrimination and retaliation for her initiation of Equal Employment Opportunity ("EEO") proceedings.

　　The Court previously dismissed McCallister's retaliation claim but permitted her sex discrimination claim to proceed. Now with the benefit of discovery, the Service moves for summary judgment. Because McCallister has identified no evidence indicating that the Service's reasons for transferring her were pretextual, nor any proper comparator who received more favorable treatment, the Court will grant the motion.

**I.   Background**

　　A.  <u>Factual Background</u>

　　Plaintiff Lori McCallister began working as a postal inspector for the U.S. Postal Inspection Service in 2007. Def.'s Stmt. of Undisputed Material Facts, ECF No. 30-2, ¶ 1. In

2015, she became a GS-14 postal inspector program manager in the Service's Communications, Governance and Strategy Group at the agency's national headquarters in Washington, D.C. Id. ¶ 2; McCallister Dep., ECF No. 32-2, at 9:2–4. McCallister's husband, Josh McCallister, is a fellow postal inspector who was promoted to Assistant Inspector in Charge for the Boston Division in 2017. Def.'s Stmt. ¶ 4. After Mr. McAllister's promotion, the Service permitted Ms. McCallister to continue her program manager role remotely from Manchester, New Hampshire. Id. ¶ 5. McCallister disputes that this was a formal "trailing spouse" arrangement, instead complaining that the Service "left [her] in limbo as to the status of her position." Pl.'s Stmt. of Material Facts in Dispute, ECF No. 32-1, ¶ 1.

In January 2019, during McCallister's remote tenure in New Hampshire, Carroll Harris, the Acting Inspector for the Communications, Governance and Strategy Group, became her supervisor. Def.'s Stmt. ¶ 7. After he became her supervisor, Harris told McCallister and another program manager, Maria Albright, that he preferred for program managers to work in the Service's national headquarters office in Washington, rather than remotely. Id. ¶ 8. McCallister also asserts that Harris told her he needed to "put eyes on" on her to make sure that she was working. Pl.'s Stmt. ¶ 2; McCallister Decl. ¶ 2.

In August 2020, Harris informed McCallister and Albright that their positions were being reassigned back to national headquarters, requiring a move to Washington. Def.'s Stmt. ¶ 9. The reasons for the transfer are disputed. The Service asserts that Harris requested the transfer so that McCallister and Albright would have "optimal awareness of ongoing activities and increased output from the positions." Id. ¶ 11. The Service further notes that "the Deputy Chief Inspectors that Plaintiff and Albright supported were located at National Headquarters," making co-location beneficial. Id. ¶ 10. McCallister, on the other hand, claims that the Service's stated

reasons are merely pretext for sex discrimination. And she has identified several putative comparators who she says were not asked to transfer. The Court will elaborate below on the Service's asserted reasons for transferring McCallister, and her objections to them.

McCallister's reassignment to the national headquarters began in December 2020. Def.'s Ex. 1, McCallister Dep. at 48. At that time, she was only required to be in the office one day each week, due to the ongoing Covid-19 pandemic. Id. In May 2024, however, McCallister began reporting to work at the national headquarters three days each week during a typical workweek. Id. at 51–52.

B. Procedural History

In December 2020, McCallister filed a formal EEO complaint alleging that her relocation and an alleged change to her relocation date constituted unlawful sex discrimination. Compl. ¶ 5; see also Mot. to Dismiss, ECF No. 5-2, Puchala Decl., Ex. 6 (EEO discrimination complaint). McCallister then filed suit in this Court, bringing sex discrimination and retaliation claims under Title VII of the Civil Rights Act. The Postal Service filed a motion to dismiss, which the Court granted in part and denied in part. The Court dismissed McCallister's retaliation claim because she had not administratively exhausted it. Mem. Op., ECF No. 14, at 6–11. The Court denied the Postal Service's motion to dismiss McCallister's discrimination claim, however, holding that it was "at least plausible that McCallister's alleged comparators, who are postal inspectors with the same pay grade and supervisor as McCallister, are similar enough to her to support an inference of discriminatory motive." Id. at 14.

Following discovery, the Postal Service filed a motion for summary judgment, which McCallister has opposed. For the reasons that follow, the Court will grant the motion.

## II.  Legal Standards

To obtain summary judgment, the moving party bears the burden of demonstrating "that there is no genuine dispute as to any material fact and [that it] is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986); Holcomb v. Powell, 433 F.3d 889, 895–96 (D.C. Cir. 2006).  A fact is "material" if it is capable of affecting the outcome of the litigation.  Holcomb, 433 F.3d at 895; Liberty Lobby, 477 U.S. at 248.  A dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  See Scott v. Harris, 550 U.S. 372, 380 (2007); Liberty Lobby, 477 U.S. at 248; Holcomb, 433 F.3d at 895.

In considering a motion for summary judgment, the Court must resolve all factual disputes and draw "all justifiable inferences" in favor of the non-moving party.  Liberty Lobby, 477 U.S. at 255; see also Mastro v. Pepco, 447 F.3d 843, 850 (D.C. Cir. 2006).  But the non-moving party's opposition must consist of more than mere allegations or denials; instead, it must be supported by affidavits, declarations, or other competent evidence, setting forth specific facts showing that there is a genuine issue for trial.  Fed. R. Civ. P. 56(e); Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).  "[T]he moving party is entitled to judgment as a matter of law if the non-moving party 'fails to make a showing sufficient to establish the existence of an element essential to [its] case, and on which [it] will bear the burden of proof at trial.'"  Eddington v. U.S. Dep't of Def., 35 F.4th 833, 836–37 (D.C. Cir. 2022).  When "determining a motion for summary judgment, the Court may assume that facts identified by the moving party in its statement of material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion."  Local Civ. R. 7(h).

To make an actionable claim of discrimination under Title VII, McCallister must allege that she has suffered an adverse employment action because of her race, color, religion, sex, or national origin. See 42 U.S.C. § 2000e et seq.; Brady v. Off. of Sergeant at Arms, 520 F.3d 490, 493 (D.C. Cir. 2008). Here, the Postal Service has offered evidence, pursuant to the McDonnell Douglas burden-shifting framework, of legitimate, non-discriminatory reasons for transferring McCallister. Lathram v. Snow, 336 F.3d 1085, 1088 (D.C. Cir. 2003) (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802–05 (1973)). Consequently, to overcome the Service's summary judgment motion, McCallister must offer sufficient evidence for a reasonable jury to infer that the Service's asserted reasons were not the actual reasons for her transfer, and that the reasons were discriminatory. See Brady, 520 F.3d at 494. In considering that question, the Court asks "whether the jury could infer discrimination from the combination of (1) the plaintiff's *prima facie* case; (2) any evidence the plaintiff presents to attack the employer's proffered explanation for its actions; and (3) any further evidence of discrimination that may be available to the plaintiff . . . or any contrary evidence that may be available to the employer." Wheeler v. Georgetown Univ. Hosp., 812 F.3d 1109, 1114 (D.C. Cir. 2016) (citing Aka v. Washington Hosp. Ctr., 156 F.3d 1284, 1289 (D.C. Cir. 1998) (en banc)).

### III. Analysis

#### A. Reasons

The Service offers a legitimate, non-discriminatory reason for transferring McCallister to the national headquarters. Her supervisor Carroll Harris recommended the transfer so that McCallister could "more fully support" the functions of deputy chief inspectors physically located in Washington. Def.'s Ex. 2 ("August Domicile Letter"), ECF No. 30-4. Allowing McCallister to keep working remotely in New Hampshire, on the other hand, "put [her and

5

Albright] at a disadvantage for situational awareness" and "easy interaction" with program managers in D.C. and limited their "contribution to rapidly evolving projects managed from within" the national headquarters. Id. Harris added at his deposition that when employees are physically located in the same space, they can better "optimize their ability to maintain awareness of each other's activities and to interface." Harris Dep., ECF No. 30-4, at 18:2–3. Moreover, moving McAllister to the national headquarters, in Harris's view, better enabled managers to assign irregular duties to her as they arose. Id. at 18:5–9.

McCallister casts the Service's stated reasons as pretextual in several ways. First, she notes that the transfer letter she received lacked an explanation, and suggests that the Service's reasoning was provided only after she challenged her relocation. Opp'n at 10. True, the August 21, 2020 letter informing McCallister of her transfer did not contain a justification for the decision. Pl.'s Ex. B, ECF No. 32-6, at 9 ("Reassignment Letter"). But Harris included the reasoning just described in an internal memorandum sent to management on August 1, 2020. See August Domicile Letter. And the reasons provided in that memorandum are consistent with Harris's deposition testimony. Compare August Domicile Letter, with Harris Dep. at 17:18-21, 18:1-9. Accordingly, McCallister's characterization of Harris's explanation as post-hoc is unavailing.

Second, McCallister notes that the West Coast Deputy Chief Inspector, Patricia Armstrong, worked "thousands of miles" away from the national headquarters, so McCallister did not need to be in Washington to support her. Opp'n at 11.[1] The Service acknowledges that Armstrong was on detail at certain points during McCallister's tenure. Reply, Ex. 9 ("Supp.

---

[1] The deposition McCallister cites for this proposition, however, includes no information about Armstrong's location.

Harris Dep."), ECF No. 35-1, at 62:23–25.  It emphasizes, however, that McCallister supported not one but four deputy chief inspectors.  Id.  And the other three inspectors were located in Washington—a fact McCallister does not dispute.  Ms. Armstrong's detail to locations outside of Washington therefore does not, in itself, demonstrate pretext.

McCallister also makes much of the fact that Harris allegedly "believed he needs to 'put eyes on' Plaintiff and other female Postal Inspectors in order to make sure that they are working."  Pl.'s Stmt. ¶ 2.  According to McCallister, Harris told her "that those that sit in the building he knows [. . . ] what they do because he can see them, [but] [Albright] and I, he doesn't know what we do because we're not there."  McCallister Dep., ECF No. 32-2, at 29:17–21.  And she claims that "Harris stated numerous times he needs to 'put eyes on' me in order to make sure that I am working."  McCallister Decl. ¶ 2.  Even on McCallister's telling, Harris's comments do not demonstrate pretext for sex discrimination.  Instead, they are consistent with the reasons Harris gave for the transfer—his belief that in-person work affords greater visibility into employee engagement.  See Harris Dep. at 17:18-21, 18:1-9 (noting that employees in the same physical location increase "their ability to maintain awareness of each other's activities.").  And even if Harris's assumption that McCallister worked less productively while remote is incorrect, that does not render it discriminatory.  The "issue is not the correctness or desirability of [the] reasons offered . . . [but] whether the employer honestly believes in the reasons it offers."  Fischbach v. D.C. Dep't of Corrs., 86 F.3d 1180, 1183 (D.C. Cir. 1996) (quoting McCoy v. WGN Cont'l Broad. Co., 957 F.2d 368, 373 (7th Cir. 1992)).  Nothing in the record suggests that Harris did not honestly hold his opinions about remote work.

Lastly, McCallister points out that since the "vast majority of employees worked remotely" during the Covid pandemic, Harris would have had no reason to transfer her in August

2020. Opp'n at 11. McCallister acknowledges, however, that even during the pandemic, she "was in National Headquarters one day a week." McCallister Dep., ECF No. 30-4, at 48:14–16. One in-person day at the office each week is more than zero. And McCallister also testified that her number of in-person days increased progressively, to two and then three days each week. Id. at 48:20–22. Transferring McCallister thus allowed the Service to benefit from one in-person day from the start. And she was thereafter readily available for more in-person days, which the Service ultimately increased. The constraints of the pandemic thus do not render Harris's reasoning pretextual, either. And once again, even if insisting on any amount of in-person work appeared unreasonable in August 2020, the wisdom of that decision is not at issue here. See Fischbach, 86 F.3d at 1183.

Accordingly, the Service has provided a legitimate, non-discriminatory reason for the transfer.

B. Comparators

The Court now turns to the heart of McCallister's case: five similarly situated male comparators who she says received more favorable treatment than she did. For a female plaintiff to demonstrate that she was the victim of gender discrimination through comparator evidence, "[she] must [ ] demonstrate that 'all of the relevant aspects of her employment situation were nearly identical to those of the male' employee." Chambers v. District of Columbia, No. 14-cv-2032, 2024 WL 3756315, at *6 (D.D.C. Aug. 12, 2024) (citing Holbrook v. Reno, 196 F.3d 255, 261 (D.C. Cir. 1999)). Factors relevant to this assessment "include the similarity of the plaintiff's and the putative comparator's jobs and job duties, [and also] whether they were disciplined [or transferred] by the same supervisor[.]" Id. (citing Burley v. Nat'l Passenger Rail Corp., 801 F.3d 290, 301 (D.C. Cir. 2015)).

*1. Paul Krenn*

McCallister first identifies Paul Krenn, a male program manager who she claims had "nearly identical job duties" and was not reassigned by Harris. Pl.'s Stmt. ¶ 8. Krenn retired from the Postal Service on October 27, 2017. Def.'s Ex. 6 ("Krenn Retirement Announcement"), ECF No. 30-4. At that time, although his position was "National Headquarters Program Manager/Postal Inspector," id., he worked remotely in Arizona. Harris Dep., ECF No. 33-1, at 77:3–6. McCallister argues that because Harris did not attempt to relocate Krenn while under his supervision, he is a proper comparator.

That argument misses the mark for two reasons. First, Krenn no longer worked for the Service at the time McCallister was transferred in August 2020. Thus, a significant and "relevant aspect of her employment situation" was not identical to Krenn's. Chambers, 2024 WL 3756315, at *6. The Service may have faced particular needs in August 2020 that it did not in years prior.

Second, Krenn's remote position resulted from an agreement he made with the Service "to accept a downgraded position and relocate to Arizona from National Headquarters." Harris Dep. at 77:3–6. In exchange for accepting a demotion from assistant inspector-in-charge to program manager, Krenn was allowed to work remotely for two years before he retired. Id. at 77:15–20. Krenn struck that deal with the Service before Harris ever supervised him. Id. at 78:3–4. As McCallister does not offer evidence indicating that she made any similar agreement with the Service, she is not similarly situated to Krenn. Nor has she introduced any evidence disputing Harris's testimony on this point. Accordingly, Krenn is not a relevant comparator.

### 2. Nate Maxwell

McCallister next points to Nate Maxwell, who she claims was a program manager hired by Mr. Harris to work remotely from Houston, Texas. Opp'n at 13–14.

Harris supervised Maxwell for four months from September 2018 until January 2019. Maxwell Dep., ECF No. 33-5, at 25:18–21. During that time, Maxwell was not ordered to report to national headquarters. Id. at 25:22–26:3. Then, starting in January 2019, Maxwell's supervision was transferred to two other inspectors, Jason Krizmanich and Jennifer McDaniel. Id. at 26:4–6. Eleven months later, in December 2019, he was ordered to move to Washington and return to national headquarters in person. Id. at 26:8–14. Maxwell refused to return, however, instead accepting a downgraded position so that he could remain in Houston. Id. at 19:10–12.

McCallister characterizes the fact that Harris did not ask Maxwell to transfer to Washington from September 2018 to January 2019—the period during which Harris supervised him—as evidence of discrimination. But during that period, *McCallister* was also permitted to work remotely. And by the time McCallister was told to relocate—August 2020—Maxwell had already received those same instructions, eight months earlier. True, Harris was no longer Maxwell's supervisor, but that only serves to confirm that Maxwell was not similarly situated to McCallister at the time of transfer. Moreover, Maxwell's choice to take a demotion rather than be transferred is another indication that the circumstances of his employment were not "nearly identical" to McCallister's, as she offers no evidence suggesting she sought or was willing to accept a similar downgrade. Holbrook, 196 F.3d at 261.

And even if Harris's decision not to transfer Maxwell two years before he asked McCallister to relocate is somehow viewed as meaningful, Maxwell had different duties than

10

McCallister.  He "was not in direct support of the Deputy Chief Inspectors that were physically located at National Headquarters," as was McCallister.  Harris Dep. at 51:22–25.  Attempting to rebut this point, McCallister points to Maxwell's testimony that even as his roles and responsibilities changed, "the core function of what I did as a program manager always remained the same."  Maxwell Dep. at 21:1–3.  True or not, this statement does not undermine Harris's testimony that Maxwell did not directly support the deputy chief inspectors.  Maxwell's job duties therefore were not "nearly identical" to McCallister's.  Holbrook, 196 F.3d at 261; see Burley, 801 F.3d at 301.  Accordingly, Maxwell was not similarly situated to McCallister and does not qualify as a proper comparator.

    3. *Richard Philip Carter*

  Next up is Richard Philip Carter, another male program manager who McCallister claims was not ordered to relocate to Washington.  Opp'n at 5.  That assertion finds no support in the record.

  Carter was detailed as an acting program manager from March 2017 until sometime in 2020, and Harris supervised him for about the last year of his detail.  Carter Dep., ECF No. 33-6, at 14:16–19, 15:13–18.  Sometime in 2020, Harris informed Carter that if he wished to keep his program manager position, he would need to move to Washington.  Id. at 16:16–21.  Carter declined, choosing instead to resume the lower-grade postal inspector position he held prior to his detail so that he could remain in Greenville, South Carolina.  Id. at 15:16–22.  Carter therefore cannot serve as a proper comparator because just like McCallister, he was asked by Harris to relocate to the national headquarters.  And as already noted, McCallister offers no evidence indicating that she sought a demotion so that she could continue working remotely.

### 4. *Kyle Rau and Brian Bundt*

Lastly, for the first time in her opposition, McCallister cites two more male employees who she claims are proper comparators. These can be disposed of in short order. The first, Kyle Rau, worked in the Contraband Interdiction and Investigative Group, a narcotics program within the Inspection Service. Opp'n, Ex. G ("Rau Dep."), ECF No. 33-3, at 12:10–12. As noted, McCallister worked in a different group—the Communications, Governance and Strategy Group. McCallister Dep. at 9:2–4. And she offers no evidence at all that Rau was ever supervised by Harris. See generally Rau Dep. (no discussion of supervision by Carroll Harris). Accordingly, Rau cannot be described as similarly situated to McCallister.

As for Brian Bundt, he was a Grade-13 postal inspector, not a Grade-14 program manager like McCallister. Anderson Dep., ECF No. 33-4, at 15:9–17. Moreover, although assigned to the national headquarters, he was permitted to work remotely in Houston due to special circumstances. After he was placed on administrative leave, Bundt entered into an agreement allowing him to work remotely in Houston on certain conditions, including retiring at his first eligibility. Id. at 14:20–22, 15:4–5, 12–14. Since McCallister does not argue that she entered into any comparable agreement, she and Bundt are evidently not similarly situated.

### IV. Conclusion

Because McCallister has provided no evidence from which a jury could conclude that Harris's reasons for transferring her were pretextual, the Court will grant the Service's Motion for Summary Judgment. A separate Order accompanies this Opinion.

CHRISTOPHER R. COOPER
United States District Judge

Date: June 5, 2025